**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


Richard W. Cody,                              :                    Case No. 1:13 CV 344
     Plaintiff,                           :
                              :
v.                                           :
                              :
Commissioner of Social Security,             :                    **REPORT AND**
     Defendant,                           :                    **RECOMMENDATION**


**I. INTRODUCTION**


       Plaintiff Richard W. Cody ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim

for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C.

§1381 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 13 and 14) and

Plaintiff's Reply (Docket No. 17). For the reasons that follow, the Magistrate recommends the opinion

of the Commissioner be affirmed in part and remanded in part.

1

## II. PROCEDURAL BACKGROUND

On November 6, 2009,[1] Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381, alleging a period of disability beginning June 1, 2009 (Docket No. 12, p. 157 of 516). Plaintiff's claim was denied initially on April 2, 2010 (Docket No. 12, p. 83 of 516), and upon reconsideration on September 8, 2010 (Docket No. 12, p. 91 of 516). Plaintiff thereafter filed a timely written request for a hearing on September 21, 2010 (Docket No. 12, p. 94 of 516).

On September 12, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Suzanne A. Littlefield ("ALJ Littlefield") (Docket No. 12, pp. 23-54 of 516). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 12, pp. 35-49 of 516). ALJ Littlefield found Plaintiff to have a severe combination of possible seizure disorder, panic disorder, substance abuse disorder, alcohol-induced psychotic disorder with hallucinations, and shoulder issues with an onset date of October 28, 2009 (Docket No. 12, p. 71 of 516).

Despite these limitations, ALJ Littlefield determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the application date through the date of her decision (Docket No. 12, p. 77 of 516). ALJ Littlefield found Plaintiff had the residual functional capacity to perform light work, as defined in 20 C.F.R. § 416.967(b), with the following exceptions:

1.    Only lift and carry ten pounds occasionally and five pounds frequently
2.    No work on ladders, ropes, or scaffolds
3.    No work at unprotected heights or around dangerous machinery
4.    No commercial driving
5.    Only occasional pushing or pulling with the upper extremity

---

[1] In the same application, Plaintiff uses October 28, 2009, as a reference date (Docket No. 12, p. 158 of 516). It appears that ALJ Littlefield opted to use this secondary date as the official application date (Docket No. 12, p. 69 of 516).

2

      6.      Only occasional overhead reaching
      7.      Only routine and multi-step tasks done in a stable environment with few changes
      8.      Only jobs with non-confrontational social interaction

(Docket No. 12, p. 73 of 516). ALJ Littlefield found Plaintiff unable to perform his past relevant work, but able to perform other work in the national economy (Docket No. 12, pp. 75-76 of 516). Plaintiff's request for benefits was therefore denied (Docket No. 12, p. 77 of 516).

On February 15, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his denial of SSI (Docket No. 1). In his pleading, Plaintiff alleged multiple errors, including: (1) a violation of the treating physician rule; (2) a failure to properly discuss the opinions of various medical sources; (3) an inaccurate residual functional capacity assessment; (4) inclusion of Plaintiff's alleged malingering; and (5) error by the ALJ at step five of the sequential evaluation (Docket No. 13). Defendant filed its Answer on May 24, 2013 (Docket No. 11).

## III. FACTUAL BACKGROUND

### A. THE ADMINISTRATIVE HEARING

An administrative hearing convened on September 12, 2011, in Cleveland, Ohio (Docket No. 12, pp. 23-54 of 516). Plaintiff, represented by counsel Kirk B. Roose, appeared and testified (Docket No. 12, pp. 27-35 of 516). Also present and testifying was VE Mark Anderson ("VE Anderson") (Docket No. 12, pp. 35-49 of 516).

### 1. PLAINTIFF'S TESTIMONY

Plaintiff gave testimony concerning a number of his alleged impairments, beginning with his mental health issues. According to Plaintiff, he has long-suffered from schizophrenia, hearing v oices and having hallucinations since he was a teenager (Docket No. 12, p. 28 of 516). The problem has intensified over time, although he has never been officially diagnosed with the disease (Docket No. 12,

p. 28 of 516). Plaintiff also stated he now suffers from anxiety and panic attacks which prevent him from going out in public (Docket No. 12, p. 28 of 516). He indicated he was seeing a psychiatrist (Docket No. 12, p. 28 of 516). According to Plaintiff, his psychiatrist prescribed him Seroquel, after which his "whole world changed" (Docket No. 12, p. 29 of 516). He stopped hearing voices and was able to function (Docket No. 12, p. 29 of 516).

Plaintiff also discussed his shoulder pain and surgeries. Plaintiff testified that he has gout problems in every joint of his body and deals with pain on a daily basis (Docket No. 12, pp. 29-30 of 516). Plaintiff stated he can hold a plate, but not if there is anything on it (Docket No. 12, p. 35 of 516). He can hold a ten-pound weight, but cannot pick it up (Docket No. 12, p. 35 of 516). Plaintiff stated he has limited mobility in his upper extremities and cannot reach overhead (Docket No. 12, p. 35 of 516).

Plaintiff reported having a heart attack which left him with only a forty percent use of his heart (Docket No. 12, p. 31 of 516). He gets out of breath easily and cannot do his prescribed exercises for more than ten minutes per day (Docket No. 12, p. 31 of 516). Plaintiff stated that he never participated in cardiac therapy, despite his doctor's orders, because the cost of the therapy was prohibitive (Docket No. 12, p. 32 of 516). Plaintiff also reported having three seizures in June 2009, after which he was placed on anti-seizure medication (Docket No. 12, p. 33 of 516). Plaintiff stated he can no longer afford this medication and last took it in late 2009 or early 2010 (Docket No. 12, pp. 33-34 of 516).

Plaintiff testified that his most recent job was working at a greenhouse moving flowers and plants (Docket No. 12, p. 27 of 516). Plaintiff stated he had to lift approximately ten pounds (Docket No. 12, p. 27 of 516) and would climb a ladder, reach up and grab the plants, and hand them to a person on the ground (Docket No. 12, p. 39 of 516). He indicated he was fired from that job because

he was off-task and would daydream (Docket No. 12, p. 27 of 516). When asked about his residual

functional capacity, Plaintiff stated he could walk approximately 300 feet before becoming out of

breath (Docket No. 12, p. 32 of 516).

### 2.   VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the

hearing, the VE described Plaintiff's past work as a nursery laborer as typically heavy and unskilled,

although the VE classified the position as "light" as Plaintiff performed it (Docket No. 12, p. 36 of

516).

ALJ Littlefield then posed her first of four hypothetical questions:

> Assume an individual of the [Plaintiff's] same age, education . . . and experience who first
> of all has no exertional limitations; could not do ladders, ropes, or scaffolding or
> commercial driving or unprotected heights or dangerous machinery all as seizure
> precautions. Could such an individual do [Plaintiff's] past work?

(Docket No. 12, pp. 36-37 of 516). Taking into account these limitations, the VE testified that such an

individual would be able to do Plaintiff's past relevant work (Docket No. 12, p. 37 of 516).

ALJ Littlefield then posed her second hypothetical question:

> For hypothetical number two, assume an individual again of [Plaintiff's] same age,
> education and experience who can lift [fifty] pounds occasionally, [twenty-five] pounds
> frequently; can sit, walk or stand for six out of eight hours; can do limited pushing and
> pulling with the left upper extremity, which would be the non-dominant hand and by that
> I mean that they could, a person could not lift anything over shoulder level. And in addition
> to that, no ladders, ropes, or scaffolding; no hazards, the same seizure precautions I
> mentioned in number one. Could that individual do [Plaintiff's] past work?

(Docket No. 12, p. 37 of 516). With those limitations, VE Anderson indicated that such an individual

could not do Plaintiff's past relevant work (Docket No. 12, p. 38 of 516).

For her third hypothetical, ALJ Littlefield questioned:

> If to hypothetical number one, we also added the limitation that the person would need to

5

do routine tasks but at a level greater than just simple, so in other words could do . . . multi-step tasks, more than one and two step tasks in a stable environment with few changes and with social interaction that would be non-confrontational . . . Could that individual do . . . [Plaintiff's] past work?

(Docket No. 12, p. 38 of 516). The VE answered in the affirmative (Docket No. 12, p. 38 of 516). For

her fourth hypothetical, the ALJ asked VE Anderson to assume:

. . . an individual of [Plaintiff's] same age, education, and experience. This person could lift with the non-dominant hand . . . [ten] pounds occasionally, five pounds frequently; could do occasional push and pull with the upper extremity and occasional overhead reaching and then the same seizure precautions that I mentioned in hypothetical one, no ladders, ropes or scaffolding, commercial driving, over unprotected heights or dangerous machinery. Could that individual do [Plaintiff's] past work?

(Docket No. 12, pp. 38-39 of 516). Again, the VE answered in the affirmative (Docket No. 12, p. 39 of

416).

The VE testified that there would also be other work in the national economy available to the

hypothetical individual, including: (1) cashier, listed under DOT[2] 211.462-010, for which there are 2.9

million positions nationally and 22,000 in northeast Ohio; (2) inspector and hand packager, listed

under DOT 559.687-074, for which there are 28,000 positions nationally and 500 in northeast Ohio;

and (3) paint spray inspector, listed under DOT 741.687-010, for which there are 65,000 positions

nationally and 1,500 in northeast Ohio (Docket No. 12, pp. 43-44 of 516).

During cross-examination, Plaintiff's counsel objected to the VE's use of both full- and part-

time positions in determining other work available in the national economy (Docket No. 12, pp. 47-48

of 516). In an oral ruling on the objection, ALJ Littlefield stated the VE "testified to significant jobs

and that's all I'm required to find and . . . there's an SSR that says if there's one job that that can be

significant. We have way more than one job" (Docket No. 12, p. 48 of 516). Counsel did not argue any

---

[2] Dictionary of Occupational Titles.

6

further, but maintained his objection (Docket No. 12, p. 48 of 516).

**B.    MEDICAL RECORDS**

    **1.    PHYSICAL HEALTH ISSUES**

Plaintiff's medical records dealing with his physical health issues date back to September 13, 2002, when Plaintiff saw Dr. Darshan Mahajan, MD ("Dr. Mahajan") complaining of very bad headaches (Docket No. 12, p. 309 of 516). Plaintiff indicated he had lost weight and was having difficulty remembering things (Docket No. 12, p. 310 of 516). Plaintiff stated that he smoked less than one pack of cigarettes per day and drank once per month (Docket No. 12, p. 310 of 516). He denied the use of any street drugs (Docket No. 12, p. 310 of 516). Plaintiff was well-oriented to day, date, month, and year, and his speech and higher cortical functions were normal (Docket No. 12, p. 310 of 516). Plaintiff's coordination and gait were also normal, although he had mild scoliosis and poor posture habits (Docket No. 12, pp. 310-11 of 516). Dr. Mahajan diagnosed Plaintiff with migraine/muscle contraction-type headaches, a frozen shoulder, and osteoarthritis in his hands (Docket No. 12, p. 311 of 516).

Plaintiff returned to Dr. Mahajan on October 15, 2002, complaining of headaches and pain in his right shoulder and neck area (Docket No. 12, p. 306 of 516). At this time, Plaintiff was living with his girlfriend and taking care of her children (Docket No. 12, p. 306 of 516). He was also smoking one pack of cigarettes per day (Docket No. 12, p. 306 of 516). Plaintiff was referred for psychological treatment and advised on the importance of stopping smoking and incorporating exercise (Docket No. 12, p. 306 of 516). On December 3, 2002, Plaintiff complained to Dr. Mahajan of increased pain in his neck and right shoulder (Docket No. 12, p. 308 of 516). Dr. Mahajan noticed changes of mild carpal tunnel syndrome upon needle electrode examination and recommended Plaintiff participate in physical

7

therapy (Docket No. 12, p. 308 of 516).

On July 10, 2003, Plaintiff saw Dr. Robert Zanotti, MD ("Dr. Zanotti") for a third dislocation of his right shoulder (Docket No. 12, p. 385 of 516). On August 7, 2003, Plaintiff underwent an arthroscopic Bankart stabilization[3] of that shoulder (Docket No. 12, p. 384 of 516). By August 14, 2003, Plaintiff's motion was within normal limits for a post-operative visit, and he reported no numbness or tingling (Docket No. 12, p. 383 of 516). Plaintiff was able to move his right shoulder in a normal fashion (Docket No. 12, p. 383 of 516). By September 4, 2003, Dr. Zanotti was recommending that Plaintiff begin active physical therapy (Docket No. 12, p. 382 of 516).

Plaintiff's records then jump to March 24, 2005, when Plaintiff returned to Dr. Zanotti complaining of a dislocation of his *left* shoulder (Docket No. 12, p. 381 of 516). Dr. Zanotti noted that Plaintiff was "very happy" with his right shoulder after surgery (Docket No. 12, p. 381 of 516). Upon examination, Plaintiff's left shoulder was found to have normal neurovascular limits (Docket No. 12, p. 381 of 516). There was no tenderness upon palpation and the limb had good motion (Docket No. 12, p. 381 of 516). Plaintiff had flexion/abduction to ninety degrees with a lot of pain (Docket No. 12, p. 381 of 516). He was diagnosed with instability of his left shoulder (Docket No. 12, p. 381 of 516).

On April 1, 2005, Plaintiff underwent an arthroscopic Bankart stabilization of his left shoulder (Docket No. 12, pp. 390-91 of 516). By April 4, 2005, Plaintiff reported his pain was under control (Docket No. 12, p. 379 of 516). By April 18, 2005, Plaintiff was moving his left elbow, hand, and wrist and could do finger walking, but no external rotation (Docket No. 12, p. 378 of 516). On May 9, 2005, Dr. Zanotti found Plaintiff's flexion/abduction was ninety degrees, and he was able to rotate his left

---

[3] A technique used in surgical repair of recurrent shoulder dislocation. It involves stitching of the labrum (a rim of fibrocartilage attached to the margin of the glenoid cavity) to the joint capsule. ATTORNEYS' DICTIONARY OF MEDICINE, B-13959 (2009).

shoulder forty degrees (Docket No. 12, p. 376 of 516). Dr. Zanotti ordered Plaintiff to wean off of his sling and begin physical therapy (Docket No. 12, p. 376 of 516).

Plaintiff did not return to Dr. Zanotti until March 20, 2008, again complaining of right shoulder pain (Docket No. 12, p. 375 of 516). Dr. Zanotti noted Plaintiff's right shoulder had some "apprehension/apprehension suppression," as well as pain and numbness (Docket No. 12, p. 375 of 516). Plaintiff was able to move his elbow, wrist, and hand (Docket No. 12, p. 375 of 516). Dr. Zanotti suggested Plaintiff get a sling (Docket No. 12, p. 375 of 516).

On November 11, 2009, Plaintiff presented to the EMH Emergency Room ("EMH") claiming to have experienced a seizure (Docket No. 12, p. 277 of 516). A CT scan of his brain was unremarkable (Docket No. 12, p. 276 of 516). On November 30, 2009, Plaintiff saw Dr. Mahajan reporting three seizures in June 2009 (Docket No. 12, p. 321 of 516). Dr. Mahajan noted that Plaintiff had not been in to see him since 2002 (Docket No. 12, p. 321 of 516). Upon examination, Plaintiff was well-oriented to day, date, month, and year (Docket No. 12, p. 323 of 516). His speech and higher cortical functions were normal (Docket No. 12, p. 323 of 516). Plaintiff had normal muscle tone, mass, gait, and sensory examination (Docket No. 12, p. 323 of 516). Dr. Mahajan diagnosed Plaintiff with partial epilepsy, generalized convulsive epilepsy, essential and other specified forms of tremor, and carpal tunnel syndrome and prescribed Clonazepam, Phenobarbital, and Zonegran (Docket No. 12, p. 324 of 516). He also suggested Plaintiff see a psychiatrist (Docket No. 12, p. 324 of 516). On December 2, 2009, Plaintiff underwent an electroencephalogram ("EEG"), which included a normal awake, drowsy, and sleep study (Docket No. 12, pp. 273, 314 of 516). No epileptic changes were seen (Docket No. 12, pp. 273, 314 of 516).

Plaintiff returned to Dr. Mahajan for a follow-up appointment on December 15, 2009 (Docket

9

No. 12, pp. 303-05 of 516). Plaintiff denied having any additional seizures, but noted that he was not

sleeping and his current medication was not helping with his anxiety and panic attacks (Docket No. 12,

p. 303 of 516). Plaintiff had a mild tremor and admitted to smoking one pack of cigarettes per day

(Docket No. 12, p. 303 of 516). Upon examination, Plaintiff was well-oriented, and his speech,

comprehension, and expression were intact (Docket No. 12, p. 305 of 516). Dr. Mahajan diagnosed

Plaintiff with partial epilepsy without impairment of consciousness, generalized convulsive epilepsy

without mention of intractable epilepsy, essential and other specified forms of tremor, and carpal

tunnel syndrome (Docket No. 12, p. 304 of 516).

On January 26, 2010, Plaintiff reported to Dr. Mahajan that he had had one seizure since his

last visit, after being off his seizure medication for two weeks (Docket No. 12, p. 315 of 516). Plaintiff

also indicated he thought he was suffering from schizophrenia and was taking Seroquel, which was

helping (Docket No. 12, p. 315 of 516). Plaintiff was well-oriented and his strength, balance, and

ambulation were good (Docket No. 12, p. 317 of 516). Plaintiff reported having difficulty with his left

upper extremity due to shoulder pain (Docket No. 12, p. 317 of 516). He was still very anxious

(Docket No. 12, p. 315 of 516).

On June 10, 2010, Plaintiff returned to Dr. Zanotti complaining of left shoulder pain (Docket

No. 12, p. 374 of 516). According to Plaintiff, the pain started after he fell on his shoulder during a

seizure (Docket No. 12, p. 374 of 516). Upon examination, Dr. Zanotti noted that Plaintiff had a

profound lack of motion and internal and external rotation were painful (Docket No. 12, p. 374 of

516). Dr. Zanotti did not find the presence of any fracture or deformity (Docket No. 12, p. 374 of 516).

On June 22, 2010, Plaintiff again saw Dr. Mahajan. He indicated he had not had any seizures

since his last appointment (Docket No. 12, p. 410 of 516). Plaintiff reported that he had run out of

Clonazepam two to three months earlier and was experiencing more tremors (Docket No. 12, p. 420 of 516). Dr. Mahajan's assessment of Plaintiff's condition remained unchanged (Docket No. 12 p. 422 of 516).

On July 1, 2010, Plaintiff underwent an MRI of his left shoulder. The scan revealed a focal intrasubstance tear in the supraspinatus with extension to the articular surface and contrast imbibition as well as a superior labral tear with extension through the anterior labrum into the inferior portion (Docket No. 12, pp. 387, 396 of 516). On July 8, 2010, Dr. Zanotti noted Plaintiff had shoulder pain upon lifting to ninety degrees and abduction to eighty degrees (Docket No. 12, p. 373 of 516). He had reasonable push/pull to the side (Docket No. 12, p. 373 of 516). Dr. Zanotti also noted that Plaintiff had not had a seizure in a couple of months (Docket No. 12, p. 373 of 516). Plaintiff's shoulder was not grossly unstable, but Dr. Zanotti noted that Plaintiff was in pain (Docket No. 12, p. 373 of 516). He concluded that Plaintiff would benefit from a diagnostic shoulder arthroscopy (Docket No. 12, p. 373 of 516).

On August 27, 2010, Plaintiff reported to EMH via ambulance complaining of radiating chest pain, shortness of breath, sweating, nausea, and dizziness (Docket No. 12, pp. 485, 488 of 516). Plaintiff reported having similar symptoms of pain for the past month (Docket No. 12, p. 485 of 516). Hospital staff performed a heart catheterization which revealed a fifty percent narrowing of the proximal and mid-left anterior descending artery, ninety-five percent narrowing of the mid-circumflex, and complete blockage of the right coronary artery (Docket No. 12, p. 465 of 516). Plaintiff was treated with the placement of two Microdriver stents, successfully reducing his coronary blockage (Docket No. 12, p. 465 of 516). During a follow-up examination on September 20, 2010, Plaintiff's physical condition was essentially normal (Docket No. 12, pp. 464-65 of 516). During an appointment

11

on May 6, 2011, Plaintiff appeared stable (Docket No. 12, p. 459 of 516). Doctors recommended that he continue his medication and diet restriction as well as engage in weight reduction, regular exercise, and smoking cessation (Docket No. 12, p. 459 of 516).

### 2. MENTAL HEALTH ISSUES

Plaintiff first reported to The Nord Center on November 20, 2009, claiming to suffer from undiagnosed schizophrenia (Docket No. 12, p. 283 of 516). Plaintiff indicated he also suffered from daily panic and anxiety attacks and had been previously treated with Xanax, which he stopped in 2005 when he lost his insurance (Docket No. 12, pp. 283, 288 of 516). Treatment records show Plaintiff has a history of felony charges, including breaking and entering, theft, complicity to aggravated trafficking of marijuana, and receiving stolen property (Docket No. 12, p. 287 of 516). He was in prison from September 1992 through December 1993 (Docket No. 12, p. 288 of 516).

During the initial evaluation, Plaintiff reported having a difficult time concentrating, mood swings, and hyperactivity (Docket No. 12, p. 289 of 516). He also indicated he suffered from auditory and visual hallucinations (Docket No. 12, p. 289 of 516). Plaintiff was alert and oriented times three (Docket No. 12, p. 291 of 516). He displayed psychomotor agitation of his feet during the session (Docket No. 12, p. 291 of 516). Plaintiff indicated he stopped using marijuana after experiencing a seizure in November 2009 (Docket No. 12, p. 291 of 516). Nord Center staff diagnosed Plaintiff with substance-induced mood disorder and cannabis dependence in early partial remission, and assigned him a Global Assessment of Functioning ("GAF")[4] score of sixty (Docket No. 12, pp. 291-92 of 516).

---

[4] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of sixty indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

Plaintiff continued to see staff at the Nord Center until early 2011 (Docket No. 12, pp. 299-453 of 516). During a June 21, 2010, assessment update, Plaintiff again reported auditory and visual hallucinations (Docket No. 12, p. 453 of 516). Plaintiff indicated that he could not go out in public because of his anxiety attacks and reported that he was currently homeless (Docket No. 12, p. 453 of 516). Plaintiff was diagnosed with an adjustment disorder with mixed anxiety and depressed mood, cannabis dependence in early partial remission, substance-induced mood disorder and psychotic disorder, and malingering (Docket No. 12, p. 453 of 516). His GAF score was sixty (Docket No. 12, p. 453 of 516). On August 16, 2010, Plaintiff indicated that he was using marijuana (Docket No. 12, p. 446 of 516).

By late September 2010, staff indicated that Plaintiff was making some progress (Docket No. 12, p. 444 of 516). In November 2010, this increased to good progress (Docket No. 12, p. 440 of 516). However, Plaintiff continued to have panic attacks in public (Docket No. 12, p. 440 of 516), difficulty sleeping (Docket No. 12, p. 433 of 516), and depressed mood, possibly over his mother's recent cancer diagnosis (Docket No. 12, p. 433 of 516).

## C.  EVALUATIONS

### 1.  PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On March 12, 2010, Plaintiff underwent a Physical Residual Functional Capacity Assessment with state examiner Dr. Esberdado Villanueva, MD ("Dr. Villanueva") (Docket No. 12, pp. 338-45 of 516). Dr. Villanueva found Plaintiff had no exertional, manipulative, visual, communicative, or environmental limitations (Docket No. 12, pp. 339-42 of 516). He determined Plaintiff could never climb ladders, ropes, or scaffolds (Docket No. 12, p. 340 of 516).

### 2.  PSYCHOLOGICAL EVALUATION

13

On March 22, 2010, Plaintiff underwent a Psychological Evaluation with Dr. Ronald G. Smith, Ph.D ("Dr. Smith") at the request of the Bureau of Disability Determination ("BDD") (Docket No. 12, pp. 346-53 of 516). During the examination, Plaintiff reported that he dropped out of school in the tenth grade and later earned his GED while in prison (Docket No. 12, p. 347 of 516). He had been in and out of jail on various charges (Docket No. 12, p. 347 of 516). He admitted to two suicide attempts, both overdoses (Docket No. 12, p. 349 of 516). Plaintiff reported that he quit drinking and using drugs (Docket No. 12, p. 350 of 516). Plaintiff claimed that he heard voices, but that this symptom improved when he was taking Seroquel (Docket No. 12, p. 350 of 516). Plaintiff also reported daily anxiety and panic attacks (Docket No. 12, p. 348 of 516). He admitted to vague suicidal and homicidal ideations (Docket No. 12, p. 349 of 516). When asked about daily activities, Plaintiff indicated he watched the TV Guide channel for hours, walked around the mall, and sometimes visited family (Docket No. 12, pp. 347, 351 of 516). Plaintiff stated he got panicky in stores, but Dr. Smith noted this did not affect his ability to go to the mall (Docket No. 12, p. 351 of 516).

During the evaluation, Plaintiff was alert and seemed in good contact with reality (Docket No. 12, p. 351 of 516). He was well-oriented to time and place and his insight and judgment were fair (Docket No. 12, p. 351 of 516). Plaintiff was cooperative and maintained good eye contact (Docket No. 12, p. 349 of 516). He was direct and his thinking seemed well-reasoned (Docket No. 12, p. 349 of 516). Plaintiff showed appropriate affective expression, but he had occasional tearfulness and noted that he felt sad everyday (Docket No. 12, p. 349 of 516). He jiggled his leg throughout the entire interview and tapped on things with his fingers (Docket No. 12, pp. 349-50 of 516). He reported that he slept well as long as he had the Seroquel (Docket No. 12, p. 351 of 516).

Dr. Smith diagnosed Plaintiff with alcohol-induced psychotic disorder with hallucinations and

14

alcohol dependence in remission, and assigned him a GAF score of fifty[5] (Docket No. 12, p. 352 of 516). Dr. Smith also noted that Plaintiff would be moderately impaired in his ability to: (1) relate to others; (2) understand, remember, and follow instructions; (3) maintain attention, concentration, and persistence; and (4) withstand the stress and pressure of day-to-day work activity (Docket No. 12, p. 352 of 516).

### 3. MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On March 29, 2010, Plaintiff underwent a Mental Residual Functional Capacity Assessment with state examiner Dr. Bruce Goldsmith, Ph.D ("Dr. Goldsmith") (Docket No. 12, pp. 354-57 of 516). Dr. Goldsmith found Plaintiff to be moderately limited in his ability to: (1) understand and remember very short and simple instructions; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (9) respond appropriately to changes in the work setting (Docket No. 12, pp. 354-55 of 516).

### 4. FIRST PSYCHIATRIC REVIEW TECHNIQUE

On the same day, Dr. Goldsmith also completed a Psychiatric Review Technique for Plaintiff (Docket No. 12, pp. 358-71 of 516). Dr. Goldsmith noted that Plaintiff suffered from alcohol-induced

---

[5] A GAF score of fifty indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

psychotic disorder with hallucinations and alcohol dependence in questionable remission (Docket No. 12, pp. 360-66 of 516). In assessing "Paragraph B" criteria,[6] Dr. Goldsmith found Plaintiff to have a moderate degree of limitation with regard to activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace, with no episodes of decompensation (Docket No. 12, p. 368 of 516). Dr. Goldsmith did not find the presence of any "Paragraph C" criteria[7] (Docket No. 12, p. 369 of 516).

### 5. PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On June 10, 2010, Dr. Zanotti completed a Physical Residual Functional Capacity Assessment for Plaintiff (Docket No. 12, p. 516 of 516). Dr. Zanotti found that Plaintiff could frequently lift/carry up to five pounds and occasionally lift/carry up to five pounds (Docket No. 12, p. 516 of 516). Dr. Zanotti also determined that Plaintiff's ability to push, pull, and reach was extremely limited (Docket No. 12, p. 516 of 516). He opined that these symptoms would last between thirty days and nine months (Docket No. 12, p. 516 of 516).

### 6. PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff underwent a third Physical Residual Functional Capacity Assessment on August 31, 2010, with state examiner Dr. Eli Perencevich, DO ("Dr. Perencevich") (Docket No. 12, pp. 411-18 of 516). Dr. Perencevich opined that Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for a total of six hours during an eight-hour day; (4) sit for a total of six hours during an eight-hour day; and (5) engage in limited

---

[6] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[7] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

pushing and pulling in his upper extremities (Docket No. 12, p. 412 of 516). Dr. Perencevich also found that Plaintiff could never climb ladders, ropes, or scaffolds, and should avoid all exposure to hazards, including machinery and heights (Docket No. 12, pp. 413, 415 of 516). Plaintiff had no manipulative, visual, or communicative limitations (Docket No. 12, pp. 414-15 of 516).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment

17

meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citin*g *Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Littlefield made the following findings:

1. Plaintiff has not engaged in substantial gainful activity since October 28, 2009, the application date.

2. Plaintiff has the following severe impairments: possible seizure disorder, panic disorder, substance abuse disorder, alcohol-induced psychotic disorder with hallucinations, and shoulder issues.

3. Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

4. Plaintiff has the ability to perform light work, as defined in 20 C.F.R. § 416.967(b), with the following exceptions: (1) only lift and carry ten pounds occasionally and five pounds frequently; (2) no work on ladders, ropes, or scaffolds; (3) no work at unprotected heights or around dangerous machinery; (4) no commercial driving; (5) only occasional pushing and pulling with the upper extremity; (6) only occasional overhead reaching; (7) limited to routine and multi-step tasks performed in a stable environment with few changes; and (8) limited to a job with non-confrontational social interaction.

5. Plaintiff is unable to perform any past relevant work.

6. Plaintiff was born on January 10, 1971, and was 38 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7. Plaintiff has at least a high school education and is able to communicate in English.

8. Transferability of job skills is not an issue because Plaintiff's past relevant work is unskilled.

9. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10. Plaintiff has not been under a disability, as defined in the Social Security Act, since October 28, 2009, the date the application was filed.

(Docket No. 12, pp. 69-77 of 516). ALJ Littlefield denied Plaintiff's request for SSI benefits (Docket

19

No. 12, p. 77 of 516).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006). In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)).

## VII. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges the ALJ failed to: (1) adequately evaluate the opinion of Plaintiff's treating orthopedist, Dr. Zanotti; (2) properly set forth and weigh the opinions of state examiners Drs. Smith and Goldsmith; (3) incorporate all of Plaintiff's limitations in her residual functional capacity assessment; (4) point to an acceptable source for Plaintiff's alleged malingering; and (5) include, in her written decision, whether part-time jobs could be considered at step five (Docket No. 13).

20

**B.    DEFENDANT'S RESPONSE**

Defendant disagrees and argues: (1) the ALJ properly included and evaluated the opinions of each medical source, including Dr. Zanotti; (2) the record did include evidence of Plaintiff's malingering; and (3) the ALJ identified a significant number of jobs at step five of the sequential evaluation, thereby fulfilling her obligation (Docket No. 14).

**C.    DISCUSSION**

**1.    TREATING PHYSICIAN RULE**

In his first assignment of error, Plaintiff alleges that the ALJ failed to follow the treating physician rule with regard to Plaintiff's treating orthopedist, Dr. Zanotti (Docket No. 13, pp. 3-6 of 11). The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.

21

> [T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). With regard to Dr. Zanotti's opinion, the

ALJ noted:

> D[r]. Zanotti limited [Plaintiff] to lifting five pounds maximum on June 20, 2010. Dr. Zanotti also said [Plaintiff] is extremely limited in pushing/pulling and reaching. Dr. Zanotti reports [Plaintiff] has left shoulder pain, but does not differentiate between lifting limits for the right or left upper extremity. He also said these limits should last between [thirty] days and [nine] months, meaning this does not meet the one-year duration requirement.

(Docket No. 12, p. 75 of 516). She therefore accorded the opinion only limited weight (Docket No. 12,

p. 75 of 516). In so doing, ALJ Littlefield was required to discuss the length of the treating

relationship, the frequency of examination, the nature and extent of the treating relationship, and the

supportablity and consistency of Dr. Zanotti's opinion with the record as a whole. *Wilson*, 378 F.3d at

544. The ALJ's decision is devoid of any such analysis (Docket No. 12, pp. 69-77 of 516). Given this

error, this Magistrate recommends the decision of the Commissioner on this issue be reversed and

remanded for further and proper analysis.

### 2.    MEDICAL SOURCE OPINIONS

In his next two assignments of error, Plaintiff alleges the ALJ failed to properly weigh and

evaluate the opinions of state examiners Drs. Smith and Goldsmith (Docket No. 13, pp. 6-8 of 11).

Specifically, Plaintiff claims the ALJ's decision "mentions Dr. Smith's conclusions generally . . . but

contains no evaluation or weighing of Dr. Smith's opinions," and fails to address Dr. Goldsmith's

opinion altogether (Docket No. 13, pp. 6-7 of 11). Plaintiff's claims essentially involve the ALJ's

failure to accurately capture Plaintiff's residual functional capacity. As such, a brief discussion of residual functional capacity is helpful.

### a.    RESIDUAL FUNCTIONAL CAPACITY

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). The Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

### b.    MEDICAL SOURCES GENERALLY

To properly determine a claimant's residual functional capacity, the Commissioner must

23

necessarily evaluate both medical and *opinion* evidence. Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite the impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). While the Social Security Administration recognizes that the opinions of a claimant's treating physician(s) bear special significance and are sometimes entitled to controlling weight, the Commissioner has an obligation to examine opinions from *any* medical source on *any* issue, even those expressly reserved to the Commissioner. SSR 96-5p, 1996 SSR LEXIS 2, *4-6 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1527(b), 416.927(b). "Because state agency consultants are experts in the Social Security Disability programs, the rules set forth in 20 C.F.R. §§ 404.1527(f) and 416.927(f) require an ALJ to consider the consultants' findings of fact about the nature and severity of a claimant's impairment(s) as opinions of non-examining physicians." SSR 96-6p, 1996 SSR LEXIS 3, *4-5 (July 2, 1996). An ALJ is "not bound by findings made by State agency or other program physicians . . ., but [he] may not ignore these opinions and must explain the weight given to the opinions in their decision." *Id*. at *5. These opinions can be given weight, however, "only insofar as they are supported by evidence in the case record." *Id*. at *6.

### 1.    DR. SMITH

As the ALJ mentioned in her decision, Dr. Smith opined that Plaintiff would be moderately limited in his ability to: (1) relate to others; (2) understand, remember, and follow instructions; (3) maintain attention, concentration, and persistence; and (4) withstand the stress and pressure of day-to-day work activity (Docket No. 12, pp. 72-73, 352 of 516). Plaintiff argues that the ALJ did not properly account for these findings in her ultimate residual functional capacity assessment (Docket No.

24

13, pp. 6-7 of 11). More specifically, Plaintiff alleges the ALJ erred by limiting Plaintiff to only "non-confrontational" social interactions and disregarding his moderate limitations on attention, concentration, and persistence (Docket No. 13, p. 6 of 11). The undersigned disagrees.

Even though an ALJ is required to consider all medical source opinions and evaluate them according to the regulations, an ALJ is "not required to discuss or summarize every piece of evidence in the record." *Szymanski v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 117096, *22-23 (N.D. Ohio 2011). While it may be ideal for an ALJ to set forth his reasons specifically crediting or discrediting each and every submitted medical opinion of record, it is well settled in the Sixth Circuit that "an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party . . . so long as his factual findings as a whole show that he implicitly resolved [any] conflict." *Loral Defense Systems-Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999).

As noted by the ALJ, Dr. Smith found that Plaintiff was able to drive and could spend a significant amount of time at the mall or visiting family without incident (Docket No. 12, p. 72 of 516). He was well-oriented to time and place and had good cognitive functioning (Docket No. 12, p. 73 of 516). Given these results, Dr. Smith saw no need to impose anything more than moderate limitations on Plaintiff's abilities (Docket No. 12, p. 352 of 516). This Magistrate would agree. During his time at the Nord Center, Plaintiff's highest GAF score was sixty, indicating only moderate symptoms (Docket No. 12, pp. 292, 453 of 516). By September 2010, Plaintiff was making progress and, in October 2010, staff described Plaintiff as "stable" (Docket No. 12, pp. 442, 444 of 516). In December 2010, Plaintiff expressed interest in living on his own (Docket No. 12, p. 438 of 516). Plaintiff admitted to being anxious and hearing voices, but always seemed to improve when taking his medications on a consistent basis, especially the Seroquel, which he claimed changed his "whole

world" (Docket No. 12, p. 29 of 516). Furthermore, staff at the Nord Center noted Plaintiff had a tendency for malingering, perhaps exaggerating his symptoms (Docket No. 12, pp. 329, 332 of 516). Although Plaintiff would have preferred the ALJ impose stricter limitations on his residual functional capacity, this Magistrate finds there to be substantial evidence to support the ALJ's current opinion. "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)). Therefore, this Magistrate finds Plaintiff's second assignment of error to be without merit and recommends that the decision of the Commissioner on this issue be affirmed.

## 2.     DR. GOLDSMITH

Plaintiff next argues the ALJ failed to mention, let alone discuss, the findings of Dr. Goldsmith, in violation of Social Security regulations (Docket No. 13, pp. 7-8 of 11). The undersigned agrees.

Under Social Security regulations, "[u]nless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . ." 20 C.F.R. § 404.1527(e)(2)(ii). This is logical: an ALJ must base her opinion on the medical evidence and opinions contained within a claimant's record. When the ALJ assigns controlling weight to the opinion of a claimant's treating physician, it is easy for the claimant to understand how the ALJ arrived at her conclusion, whatever it may be. Without this controlling weight, however, a claimant is left to wonder about the basis for the denial of benefits. While ALJ Littlefield was not required to agree with Dr. Goldsmith's findings in assessing Plaintiff's residual functional capacity, she *was* required to at least mention it, something the ALJ failed to do

26

(Docket No. 12, pp. 69-77 of 516). Therefore, this Magistrate recommends the decision of the Commissioner on this issue be reversed and remanded for further consideration.

### 3.    PARAGRAPH B CRITERIA AND RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next argues that the ALJ failed to properly account for Plaintiff's moderate mental limitations, found in the "Paragraph B" criteria, in her hypothetical questions and corresponding residual functional capacity assessment (Docket No. 13, pp. 8-9 of 11). Defendant argues that Paragraph B criteria are not equivalent to a residual functional capacity finding and are therefore not required to be made part of that assessment (Docket No. 14, pp. 15-16 of 19). Defendant is correct.

As ALJ Littlefield noted in her decision,

> [t]he limitations identified in the Paragraph B criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps [two] and [three] of the sequential evaluation process. The mental residual functional capacity assessment used at steps [four] and [five] of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders Listings in 12.00 of the Listing of Impairments.

(Docket No. 12, p. 73 of 516); *see also* SSR 96-8p, 1996 SSR LEXIS 5, *13 (July 2, 1996) ("[t]he adjudicator must remember that the limitations identified in the 'paragraph B' . . . criteria are not a [residual functional capacity] assessment . . . . ). For the case at hand, and contrary to what Plaintiff would have this Court believe, just because the ALJ "cited with approval" Dr. Smith's findings of moderate limitations in Paragraph B criteria does *not* mean she was required to make corresponding findings when assessing Plaintiff's residual functional capacity. Therefore, Plaintiff's fourth assignment of error is without merit and the Magistrate recommends the decision of the Commissioner on this issue be affirmed.

### 4.    MALINGERING

Plaintiff next argues that the ALJ inappropriately mentioned Plaintiff's alleged malingering in

27

her written decision (Docket No. 13, p. 9 of 11). Specifically, Plaintiff claims that this condition was never documented by any credible source and therefore potentially damaging to Plaintiff's credibility (Docket No. 13, p. 9 of 11). Yet, in his assignments of error, Plaintiff does not make a credibility argument (Docket No. 13). Furthermore, staff at the Nord Center, where Plaintiff was treated for nearly two years, noted Plaintiff's malingering behavior on at least two occasions (Docket No. 12, pp. 329, 332 of 516). As such, Plaintiff's fifth assignment of error is without merit and the Magistrate recommends the decision of the Commissioner on this issue be affirmed.

### 5.   STEP FIVE DETERMINATION

Finally, Plaintiff alleges the ALJ erred by including part-time work in the number of jobs available for "other work" at step five of the sequential analysis (Docket No. 13, pp. 9-10 of 11). According to Plaintiff, who relies upon SSR 96-8p, "[o]nly full-time jobs are relevant at step five" (Docket No. 13, p. 9 of 11). The undersigned disagrees..

At step five, the ALJ must determine whether a claimant is able to do any "other work" in the national economy, given his age, education, work experience, and residual functional capacity. 20 C.F.R. § 416.920(a)(4)(v). If a claimant can make the transition to other work, the ALJ must then demonstrate that this other work exists in significant numbers in the national economy. 20 C.F.R. § 416.920(c).

VE Anderson testified that there were a number of other jobs in the national economy that Plaintiff could perform, including: (1) cashier, listed under DOT 211.462-010, for which there are 2.9 million positions nationally and 22,000 in northeast Ohio; (2) inspector and hand packager, listed under DOT 559.687-074, for which there are 28,000 positions nationally and 500 in northeast Ohio; and (3) paint spray inspector, listed under DOT 741.687-010, for which there are 65,000 positions

nationally and 1,500 in northeast Ohio (Docket No. 12, pp. 43-44 of 516). During cross examination, Plaintiff's counsel questioned whether these numbers included both full- and part-time positions, to which the VE answered in the affirmative (Docket No. 12, p. 46 of 516). The VE testified that further calculations would be required to specifically determine how many full-time positions were available (Docket No. 12, p. 47 of 516). Counsel never asked the VE to perform these calculations (Docket No. 12, p. 47 of 516). Plaintiff's counsel then objected when the ALJ stated that it was unnecessary to get into whether the other work provided included both full and part-time positions (Docket No. 12, p. 48 of 516). Even after ALJ Littlefield's oral ruling on the issue, counsel still requested a written ruling (Docket No. 12, p. 48 of 516).

Prior to SSR 96-8p, the Sixth Circuit classified part-time work as "substantial gainful activity," thereby allowing an ALJ to find a claimant capable of working even if his or her residual functional capacity permitted work only on a part-time basis. *See Janda v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 88196, *22 (N.D. Ohio 2013) (*citing Conn v. Sec'y of Health & Human Servs.*, 51 F.3d 607, 610 (6th Cir. 1995); *Davis v. Sec'y of Health & Human Servs.*, 915 F.2d 186, 189 (6th Cir. 1990)). In 1996, SSR 96-8p changed this thinking, requiring an ALJ to base her residual functional capacity assessment on a claimant's ability to perform *full-time* work, which is defined as "[eight] hours a day, for [five] days a week, or an equivalent work schedule." 1996 SSR LEXIS 5 at *19; *see also DeRossett v. Astrue*, 2009 U.S. Dist. LEXIS 108841 (E.D. Ky. 2009). However, the Ruling is silent as to the testimony of a VE and whether the expert may offer both full- and part-time positions when describing other available work. 1996 SSR LEXIS 5. Therefore, SSR 96-8p "is only relevant to step five . . . because it relates to the ALJ's determination of [residual functional capacity] which is used to determine whether an individual is capable of performing other work in the event that he is unable to

29

perform past relevant work or . . . has no past relevant work." *Janda*, 2013 U.S. Dist. LEXIS at *22-23 (*citing DeRossett*, 2009 U.S. Dist. LEXIS 108841 at *5).

The undersigned Magistrate is not persuaded to rule differently based upon the case law cited by Plaintiff. In *Kane v. Astrue*, 2011 U.S. Dist. LEXIS 85332 (N.D. Ohio 2011), the plaintiff presented with a series of limitations that seriously called into question her ability to complete a normal workday and workweek. *Kane*, 2011 U.S. Dist. LEXIS 85332 at *14. As such, this Court vacated the ALJ's decision and ordered the Commissioner, on remand, to consider the Plaintiff's capacity for full time work, as it related to a step five determination. *Id*. at *14-15. Plaintiff also cites to *DeRossett v. Astrue*, 2009 U.S. Dist. LEXIS 108841 (E.D. Ky. 2009) in which the Plaintiff was found capable of performing full-time work but argued that the ALJ based his decision at step five on flawed data. *DeRossett*, 2009 U.S. Dist. LEXIS 108841 at *13. According to the plaintiff, the VE was required to distinguish between full and part-time work. *Id*. The Court found the plaintiff's argument to be without merit, holding that the plaintiff failed to cite a law or regulation "standing for the proposition that an ALJ's [sic] must ask . . . the VE whether his testimony was referring to part-time or full-time work." *Id*. at *15. Furthermore, there was no evidence that the plaintiff in *DeRossett*, unlike the plaintiff in *Kane*, was only capable of part-time work. *Id*.[8]

The case at hand is more closely akin to *DeRossett*: Plaintiff's counsel cites no case law or regulation that actually prohibits a VE from providing both full- and part-time positions. Furthermore,

---

[8] Plaintiff also cites to *Welch v. Astrue*, 2011 U.S. Dist. LEXIS 113308 (N.D. Ohio 2011), which, relying on *Kane*, reversed and remanded the Commissioner's decision at step give given the VE's failure to distinguish between part- and full-time jobs. 2011 U.S. Dist. LEXIS 113308 at *15-16. The *Welch* Court misread the holding in *Kane*: the issue in that case was not remanded simply because the VE provided both full- and part-time "other work" which the ALJ relied upon at step five; rather, it was remanded because there was substantial evidence that the plaintiff could only do part-time work. Given this misinterpretation, the *Welch* decision is not relevant to the case at hand.

despite SSR 96-8p's ruling that the ALJ's residual functional capacity determination be based on an individual's ability to do full-time work, Plaintiff cites no caselaw or regulation that requires an ALJ's *step five* determination to be based on full-time work alone. Therefore, Plaintiff's assignment of error is without merit and the Magistrate recommends the decision of the Commissioner on this issue be affirmed.

## VIII.  CONCLUSION

For the foregoing reasons, this Magistrate recommends the decision of the Commissioner be affirmed in part and remanded in part, pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the Magistrate recommends the Commissioner properly consider the opinions of Plaintiff's treating orthopedist, Dr. Zanotti and state examiner Dr. Goldsmith. All remaining allegations of error are without merit and the Magistrate recommends they be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   September 24, 2013

31

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.